(No. 35929.

JOHN B. GANNON, Appellant, *vs.* CHICAGO, MILWAUKEE, ST. PAUL AND PACIFIC RAILWAY Co., Appellee.

*Opinion filed June 14, 1961.*

Leonard M. Ring, of Chicago, (William C. Wines, of counsel,) for appellant.

Lord, Bissell & Brook, of Chicago, (Gordon R. Close, Jay Smyser, and Richard E. Mueller, of counsel,) for appellee.

Mr. Justice Bristow delivered the opinion of the court:

The circuit court of Cook County entered judgment on a jury verdict awarding plaintiff, John Gannon, $45,000

under the civil liability provisions of the Illinois Structural Work Act, for personal injuries he sustained while engaged in construction work on the premises of defendant, Chicago, Milwaukee, St. Paul and Pacific Railway Co. The Appellate Court reversed that judgment, (25 Ill. App. 2d 272,) and we have allowed plaintiff's petition for leave to appeal.

The essential issue is the nature of the owner's liability under the Structural Work Act (Ill. Rev. Stat. 1953, chap. 48, pars. 60 to 69,), commonly referred to as the Scaffold Act.

The controlling facts are not controverted. From early September 1955 to November 3, 1955, the date of the occurrence, the freight dock on defendant's premises was being rebuilt. The engineering and architectural plans for the work were prepared by the office of the chief architect of the railroad, who was also charged with inspecting the work to see that it was constructed according to specifications. All the construction work, including the bricklaying, assembling and construction of the scaffolds and other operations were done by E. H. Marhoefer & Co. and its employees under a contract with the railroad. Although the railroad architect and engineers made frequent inspections of the structural activities, there was no inspection of the scaffolds or ladders or other appliances at any time, and they exercised no control over the manner in which the work was being done.

The scaffolds used on the project by Marhoefer were constructed of metal tubing, with wooden planks on top of it, and consisted of several sections which were assembled and reassembled by Marhoefer's employees as the work progressed. The particular scaffold involved consisted of two 5-foot sections fitted together to make a 10-foot high scaffold, and had no guardrail. Marhoefer employees also constructed the ladder, which was approximately 14 to 16 feet long, consisting of wooden two-by-fours with one-by-fours as rungs.

At approximately 1:30 P.M. on November 3, 1955, the bricklayers were working on the south wall of the structure. The scaffold was in place, and a ladder had been set against it to enable the men to climb upon it. Since the structure was not under roof and it had snowed the night before, there were patches of ice and slush on the concrete floor, and the ladder was set on such a spot. The ladder was not nailed to the scaffold, although according to the testimony of the bricklayers it should have been under the custom of the trade. In fact, none of the Marhoefer employees who testified noticed whether any of the ladders on this construction job were nailed to the scaffolds. It is not clear from the evidence, moreover, just how long the ladder had been in place at the time of the occurrence, for other employees who had been working on the south wall before lunch testified that they had used it. Two of the bricklayers were on top of the scaffold waiting for guide marks to continue laying bricks, and another bricklayer was at the 5-foot level of the scaffold to hand the bricklayers the necessary equipment as they worked. Plaintiff had been assisting the Marhoefer foreman in "shooting some points," or guides to aid the bricklayers in establishing heights for the construction of doors and windows. He needed his level, which was on top of the scaffold, and started up the ladder. As he was about to step onto the scaffold, the ladder began to slip. There was no railing on the scaffold and he grabbed the ladder and fell on top of it, face down, on the concrete floor of the building.

Plaintiff was helped into the shanty by two bricklayers, and then taken to the hospital. No employees of the railroad were present at the time of the accident. According to medical testimony, plaintiff sustained a compressed fracture of several vertebrae and suffered certain disc pathology which is deemed permanent. We shall not review the extent of the injuries, since they are not an issue.

On the basis of substantially the foregoing evidence,

the jury returned a verdict for plaintiff for $45,000, on which the court entered judgment. The Appellate Court reversed that judgment on the grounds that there could be no recovery against an owner under the civil liability provisions of the Structural Work Act, unless he was in charge of the construction work, and that the evidence did not establish that the defendant owner was guilty of any wilful violation of the act.

Inasmuch as the material facts in this case are not in dispute, and the controversy is over the proper construction of the Structural Work Act, hereinafter referred to as the Scaffold Act, and whether the facts sustain a cause of action thereunder, the case presents essentially a question of law (*Babbitt* v. *Grand Trunk Western Railway Co.* (1918), 285 Ill. 267) within the purview of our review under section 92(3)(b) of the Civil Practice Act. Ill. Rev. Stat. 1959, chap. 110, par. 92(3)(b).

In view of the fact that liability under the Scaffold Act is an important part of the daily grist of our legal and economic affairs, and since both parties and the Appellate Court have cited the *Kennerly case* (*Kennerly* v. *Shell Oil Co.* (1958), 13 Ill.2d 431) in support of diametrically opposite interpretations of the act, we believe that a clarification of this law is warranted. Consequently, we shall reexamine the cases construing the act and submit our interpretation in the light of the statutory history and objectives of the act.

The Scaffold Act was enacted in 1907. The relevant portions of the statute involved in this litigation provide:

"§ 1. * * * all scaffolds, hoists, cranes, stays, ladders * * * erected * * * by any person, firm or corporation in this State for the use in the erection, repairing, alteration, removal or painting of any * * * building * * * shall be erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protec-

tion to the life and limb of any person or persons employed or engaged thereon * * *.

* * *

"§ 9. Any owner, contractor, sub-contractor, foreman or other person having charge of the erection, construction, repairing, alteration, removal or painting of any building * * * or other structure within the provisions of this act, shall comply with all the terms thereof, and any such owner, contractor, sub-contractor, foreman or other person violating any of the provisions of this act shall upon conviction thereof be fined not less than $25, nor more than $500 or imprisoned for not less than three months nor more than two years or both fined and imprisoned in the discretion of the court * * *. For any injury to person or property, occasioned by any wilful violations of this act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured, for any direct damages sustained thereby."

The act was first construed by this court in *Claffy* v. *Chicago Dock and Canal Co.* (1911), 249 Ill. 210. The court specifically stated at p. 217, "* * * we are concerned, in the decision of this case, only with said section 7." The relevant portion of that section requires owners or contractors to enclose elevator shafts with an 8-foot barrier. The section does not contain the qualifying words "having charge of" after the word "owner," as appears in section 9.

It was argued in the *Claffy case* that liability under section 7 was that of the contractor and not of the owner. The court set forth the reasoning in the New York case of *Rooney* v. *Brogan Construction Co.* 107 App. Div. 258, 194 N.Y. 32 (1909), which construed a New York statutory provision similar to section 7. The New York court stated at p. 35 that whether compliance with the statute rested upon both owners and contractors irrespective of control was open to grave doubt, that the more reasonable

construction would impose such duty only upon the person who had possession and control, and that the evidence therein left considerable doubt whether the owner ever did part with control and supervision of the building, but the inference was that it did not not. It may be noted that in subsequent cases the New York court followed that construction. *Sweeney* v. *Spring Products Co.* (1939), 257 App. Div. 104, 12 N.Y.S.2d 72; *Italiano* v. *Jeffrey Garden Apts.* (1957), 3 N.Y.2d 977, 169 N.Y.S.2d 737.

Without clearly accepting or rejecting the New York court's reasoning, our court in the *Claffy case* followed the same approach and found that the owner therein retained control of the premises and was therefore liable for violating section 7 of the act. The court stated at p. 222: "In our opinion it was intended by section 7 to, and said section 7 does, impose upon both the contractor and the owner the duty of complying with the provisions of said section so far as civil liability is concerned, but under the facts in this case the owner never parted with the control and supervision of the building to any contractor, but through its agent, the architect, retained control and supervision of the work and was subject to the civil liabilities provided by the act for a failure to comply with the requirements of section 7. We cannot agree with the contention of appellant that the architect, under the facts in this case, can be considered as an independent contractor having exclusive control and charge of the building and the work."

The *Claffy case* was reviewed several years later in two Appellate Court decisions. (*Mindrop* v. *Gage,* 189 Ill. App. 599; *Breton* v. *Levinson* (1917), 207 Ill. App. 406.) In 1914, in *Mindrop* v. *Gage,* involving liability under section 9 of the act for the improper operation of a derrick, the court found that the decision in the *Claffy case* was predicated on "the retention of control by the owner," and that the court had construed only the language of section 7. Since that section specifically imposed upon both the con-

tractor and the owner the duty of compliance, but did not contain the limitation "having charge of" found in section 9, the court held that the owner or contractor was in a different position in section 7 than in section 9. In rejecting the contention that it was implied by the statute that any owner, contractor, etc., connected with any erection must, in the purview of the statute, be held to have charge of it, the court stated, "We do not think this is a natural meaning of the language, and we do not think the Supreme Court has so held or meant to so hold in the *Claffy case*."

In 1917, in *Breton* v. *Levinson,* 207 Ill. App. 406, the Appellate Court again emphasized the distinction in the language between section 7 of the Scaffold Act construed in the *Claffy case,* and sections 9 and 1, which are also involved in the case at bar.

This court, in 1924, in *Griffiths & Son Co.* v. *National Fireproofing Co.* 310 Ill. 331, in the course of sustaining the validity of an indemnity agreement between a subcontractor and a contractor, commented on the *Claffy case* and the Scaffold Act. Without referring to the phraseology of either section 1 or section 9, the court stated that since the enactment of this law the owner and every contractor and subcontractor are equally bound by the act to comply with its provisions and cannot evade liability to persons injured by wilful violations of the act, by an agreement with a contractor or subcontractor.

In 1956 our Appellate Court, without any discussion of authorities, refused to impose liability on the defendant owner under section 9 of the Scaffold Act on the ground that the evidence failed to establish the essential element that defendant was actually in charge of the construction of the building. *Taber* v. *Defenbaugh,* 9 Ill. App. 2d 169.

The following year, the Federal court in *Schmid* v. *United States,* 154 F. Supp. 81, considered the owner's liability under the Illinois Scaffold Act and the cases construing it. The court interpreted the *Claffy case* as impos-

ing liability on the owner on the ground that he never parted with control; and found that the *Griffiths case* held only that it was not contrary to public policy for a subcontractor to contract to idemnify the owner or contractor for damages caused by the subcontractor's negligence. Since some of the language in that case relative to the Scaffold Act was not necessary to the decision, it was not deemed binding in view of the principle that a judicial opinion is authority for only what is actually decided. *Village of Lombard* v. *Illinois Bell Telephone Co.* 405 Ill. 209.

In support of its interpretation that the legislature intended that the persons designated shall be liable for injuries caused by failure to comply with the act, provided that they are in charge of the project, the Federal court pointed out that the act designates such persons in the disjunctive rather than in the conjunctive, and includes the words "having charge of" which, obviously, were not intended to be idle. The court reasoned further that the words "owner, contractor, sub-contractor, foreman or other person" are all enumerated in order that there may be no escape from liability by any such person "having charge of" the project, and that there was no intention to impose liability upon the owner to the exclusion of all other considerations set forth in the act.

While the motion for new trial in the *Schmid case* was pending, our court in 1958 decided the *Kennerly case*. (*Kennerly* v. *Shell Oil Co.* 13 Ill.2d 431.) That case involved an action under section 9 of the Scaffold Act by an employee of an independent contractor against the owner of the premises for injuries sustained when the employee fell from a scaffold built by other employees of the contractor in the course of certain construction work. The court, in reliance essentially on the *Claffy* and *Griffiths cases,* rejected the defendant's contention that the statute imposed liability only upon the person having charge of the work, on the ground that the settled construction of the act was

otherwise. After noting that the act deals with highly dangerous activities, the court held that the Scaffold Act has been regarded from the outset as "intended to fix an independent, nondelegable duty of compliance upon the owner of the property and upon each contractor and subcontractor engaged in the work." The court did not feel at liberty to change that construction. It also sustained the constitutionality of the act, and construed the term "wilful violation" in the act as being synonymous with "knowing" violation, so that an owner is liable where the dangerous condition is known to him or when, in the exercise of reasonable care, the existence of the dangerous condition could have been known to him.

The *Kennerly* case has been uniformly interpreted by the Federal and Illinois Appellate Courts,, with the exception of the court below, as imposing an absolute, and independent nondelegable duty of compliance on owners, beyond the doctrine of *respondeat superior,* and irrespective of whether control has been given to an independent contractor. (*Schmid* v. *United States* 273 F.2d 172; *Pankey* v. *Hiram Walker & Sons,* 167 F. Supp. 609; *Bounougias* v. *Republic Steel Corp.* (7th cir.), 277 F.2d 726; *Braden* v. *Shell Oil Co.* 24 Ill. App. 2d 252; *Moroni* v. *Intrusion-Prepakt, Inc.* 24 Ill. App. 2d 534.) In fact, as pointed out by the Federal court in *Pankey* v. *Hiram Walker & Sons,* under the interpretation of the *Kennerly* case the act imposes "absolute liability in civil cases upon each of the persons to whom it is expressly applicable," and "control of the structural activities is not a relevant factor." In the *Bounougias* case the Circuit Court of Appeals stated that the *Kennerly* case construed the word "or" in the act to be "and," and held that the act imposed liability on the owner and all other designated persons.

In sharp contrast, the Appellate Court herein endeavored to bring the *Kennerly* case within the orbit of the cases requiring that the owner have control of the operation be-

fore liability can be imposed on him under the Scaffold Act. The court held that the *Kennerly case* in effect applied the words "having charge of" in determining the owner's liability, although they were not at issue in the case.

From this review of the cases involving the owner's civil liability under the Scaffold Act, it is evident that there has been no unanimity either on the meaning of the act or on the scope of the decisions construing it. No amount of refined judicial reasoning can obscure the fact that the decision in the early *Claffy case* is ambiguous. While the court purported to construe only the phraseology of section 7, relating to the duty of owners or contractors to enclose shafts for elevating machines or hoisting apparatus, nevertheless, any civil liability for failure to comply therewith had to be imposed under the terms of section 9. That section is the only one which prescribes the penalties and authorizes the recovery of damages. Yet, the court in the *Claffy case* made no reference to section 9.

Equally serious is the fact that it is not clear on what basis the court predicated its decision. The court neither expressly adopted nor rejected the New York construction of a similar statute, but then used the same approach as the New York court in concluding that the owner did not part with control, and that the architect could not be considered to be an independent contractor. If the court intended to impose liability on the owner irrespective of whether he had charge of the structural work, as plaintiff suggests, there would have been no purpose in discussing whether the architect was an independent contractor or the owner's agent. In view of the ambiguity in that case, we cannot in good conscience regard it as an authoritative precedent on the issue at bar.

While the Appellate Court decisions distinguishing the *Claffy case* and interpreting section 9 as imposing civil liability only upon an owner "having charge of" the erection of the structure (*Mindrop* v. *Gage*, 189 Ill. App. 599;

*Breton* v. *Levinson,* 207 Ill. App. 406) certainly are not binding upon this court, nevertheless, they are of historical interest and reflect the legal climate during the years immediately following the enactment of the Scaffold Act.

Nor can the *Griffiths case* be deemed a binding precedent, since the court neither considered the phraseology of section 9 of the act, nor actually adjudicated the owner's liability to the injured person under the statute. Hence, as noted in the original *Schmid* opinion (154 F. Supp. 81), the gratuitous statements in the *Griffiths case* relative to the owner's nondelegable duty under the Scaffold Act are of limited cogency.

In our opinion, it was not until the *Kennerly case* that this court squarely and unequivocally interpreted an owner's civil liability under section 9 of the Scaffold Act. Defendant and the Appellate Court argue that since the facts appearing in the abstract of that case, as well as the opinion, revealed that the defendant owner did have charge of the particular operation which caused the injury, the court was not obliged to construe the phrase "having charge of" in section 9 of the act. That argument must be rejected on two accounts.

Insofar as it requires reference to facts not appearing in the opinion, but only in the abstract, in determining the *ratio decidendi* of that case, the argument interjects a new and distorted concept of *stare decisis.* It is one thing to state that judicial opinions must be read as applicable only to the facts involved, and quite another to insist that those facts must be ascertained *dehors* the opinion. Unless the opinion itself is the source of the operative facts, there could never be even a modicum of certainty as to the basis of the decision, and the entire concept of *stare decisis* would become unworkable. Secondly, the language of the *Kennerly* opinion itself shows that the court equivocally construed the issue. At p. 433 the court referred to defendant's argument that the statute imposed liability only upon the person "hav-

ing charge of" the work, and that it was not liable because the work was being done by an independent contractor. The court then squarely rejected that argument by stating, "If the question were one of first impression, the contention thus urged would be a serious one, for the liability that the statute imposes is stated in the disjunctive. There is, however, a long history of interpretation that refutes the defendant's position."

Our analysis of the case law, however, has revealed no such settled course. In reconsidering the construction of this act, we must apply the legal axiom that the words of a statute should be construed to give effect to the legislative intention, which must be ascertained not only from the language of the entire act, but from the evil to be remedied and the object to be attained.

Under the common law prevailing before the enactment of the Scaffold Act, an employer, or person in charge, was required to use ordinary and reasonable care for the safety of his employees while they were performing their work. Set off against this duty of reasonable care were the common-law defenses of contributory negligence, assumption of risk and the fellow servant rule. Without dwelling upon the injustices of this situation, or the difficulty of recovery, it is evident that "the person in charge" frequently did escape liability, contrary to plaintiff's assertion. Beckner, A History of Labor Legislation in Illinois, 434; I Angerstein, Illinois Workmen's Compensation, 2—7; *Schultz* v. *Ericsson Co.* 182 Ill. App. 487, 490, aff'd 264 Ill. 156.

It was in this legal climate that the Scaffold Act was enacted in 1907, before there was an Illinois Workmen's Compensation Act. As its title signifies, the Scaffold Act endeavored to give protection to workmen engaged in structural work by requiring certain standards for such work, and by providing both criminal penalties and civil liability for failure to comply therewith. The statutory purpose, as interpreted in the early *Schultz case (Schultz*

v. *Ericsson Co.* 264 Ill. 156, 164) was "to prevent injuries to persons employed in this dangerous and extrahazardous occupation, so that negligence on their part in the manner of doing their work might not prove fatal." It was held, therefore, that the doctrines of assumed risk and contributory negligence had no application to the Scaffold Act, since it was patterned after the mining statute, which had been similarly construed.

Four years after the Scaffold Act was passed, the Workmen's Compensation Act was enacted in 1911. Since structural workers were under that statute, and since it limited actions against employers to the remedy of the Workmen's Compensation Act, and, by virtue of "section 29," barred actions against third party tortfeasors who were also under the act, there was limited recourse to the Scaffold Act in the ensuing years. However, after section 29 of the Workmen's Compensation Act was held unconstitutional, and the employee's right to sue third party tortfeasors responsible for his injuries was established, the civil liability provisions of the Scaffold Act were frequently invoked.

From this statutory history it is evident that the Scaffold Act, originally enacted to give some protection to structural workers engaged in extrahazardous work at a time when there was no workmen's compensation act is now relied upon as an additional remedy against third persons. Moreover, in determining the third persons against whom such an action will lie, plaintiff contends that the Scaffold Act incorporates the concept of nondelegable duties. While that concept was applied at common law in some extrahazardous situations to impose liability on employers to their employees for the negligence of an independent contractor, plaintiff ascribes to the legislature of 1907 an intention to impose such nondelegable duties not merely on employers, but on contractors, subcontractors, foremen, and even upon all other persons who might be connected with the project, such as representatives of bonding companies

who may reserve the right to supervise the construction. According to plaintiff, each of these persons has, under the Scaffold Act, a nondelegable duty whereby if he knew that scaffolds would be used on the project he was obliged to see that any ladders were placed against scaffolds in a safe manner. If such ladders were placed improperly, as alleged in the instant case, then each one of such persons would be liable for a breach of his nondelegable duty, irrespective of his connection with the work, or how many intervening contractors were involved in the execution of the task.

It is not possible for us to perceive such a legislative intention in 1907, when no such absolute liability was even imposed upon the immediate employer, much less upon all enumerated persons in addition. In fact, liability without fault was then frowned upon in the law, and the Workmen's Compensation Act itself was sustained on the ground that it was a reasonable regulation of the master-servant relationship providing for scheduled damages. *Grasse v. Dealer's Transport Co.* 412 Ill. 179, 191; *Illinois Publishing and Printing Co.* v. *Industrial Com.* 299 Ill. 189.

Moreover, the plain words of the statute preclude plaintiff's interpretation. The act specifies, "Any owner, contractor, sub-contractor, foreman or other person having charge of the erection, construction, repairing, alteration, removal or painting of any building, bridge, viaduct or other structure within the provisions of the act, shall comply with all the terms thereof, * * *." It is inescapable from these words that the legislature intended to hold liable those named persons who are in charge of the work, and the words "or other person" were included to cover the situation where someone other than the named persons was in charge of the work, in order to prevent such person from escaping liability.

As aptly stated by the Federal court at p. 88 of the first *Schmid* opinion (154 F. Supp. 81), antedating the *Kennerly case*, "It was not the intention of the legislature that the

owner should be liable regardless of who was in charge of the work, but to hold the person in charge of the work responsible regardless of whether it was the owner, contractor, sub-contractor, foreman or other person having charge of the building project. This can be the only logical conclusion. If the legislature intended otherwise, certainly more appropriate and clearer and less ambiguous language could have been used."

This interpretation is further evident from the use of the word "or" rather than "and" in the enumeration of the persons required to comply with the statute. That fact was noted by the Circuit Court of Appeals in *Bounougias* v. *Republic Steel Corp.* (7th cir.) 277 F.2d 726. Although that court was constrained to follow the State court's interpretation of State statutes, it commented that the *Kennerly case* construed the word "or" in the act to be "and" in order to impose liability on all enumerated persons.

If we were to construe the phrase "having charge of the erection, construction, repairing, alteration, removal or painting of any building, bridge, viaduct or other structure within the provisions of this act" as applying to and qualifying only the words "other person," as plaintiff suggests, the provision would have no meaning. It is certainly indisputable that the statute applies only to owners of buildings or structures within the provisions of the act, which are being constructed, repaired, *et cetera,* yet there is no way to include those identifying features without including the words "having charge of" as far as owners, contractors, subcontractors and foremen are concerned, without removing the rest of the phrase and the heart of the provision.

Moreover, to construe the statute as plaintiff suggests would mean that every subcontractor or foreman on the job, irrespective of his assignment, would have a duty to see that every other subcontractor or foreman complied with the provisions of the Scaffold Act or otherwise sustain liability

under the act. The implausibility of that construction is self-evident.

Furthermore, in construing section 9 in its entirety, as we are obliged to do, we note that the legislature imposed civil liability only for "wilful violations." Wilful violations means knowing violations, and in the nature of things they can be perpretrated only by persons directly connected with the operations, and not by virtue of mere ownership of the premises. The inclusion of this phrase in the act, therefore, further evidenced a legislative intention to impose the duty of compliance upon those having charge of the work.

In sharp contrast to the language in this statute is the phraseology of the Liquor Control Act (Ill. Rev. Stat. 1959, chap. 43, par. 135,) in which the legislature, in order to effectuate a public purpose, imposed in unequivocal terms liability on the owner irrespective of his control over or participation in the tortious act. (*Wanack* v. *Michels,* (1905), 215 Ill. 87.) That act specifies joint and several liability for "any person owning, renting, leasing or permitting the occupation of any building or premises, and having knowledge that alcoholic liquors are to be sold therein, or who having leased the same for other purposes, shall knowingly permit therein the sale of any alcoholic liquors."

The Dram Shop Act was enacted prior to the Scaffold Act, and in the absence of such clear language in the Scaffold Act indicating an intention to impose a nondelegable duty on the owner, we do not believe that such a departure from recognized bases of liability can be inferred. In our opinion, the words of section 9, construed in the light of the statutory history, impose a duty of compliance upon an owner or other enumerated person having charge of the work. Any other interpretation would do violence to the act by deleting from it an integral phrase, and by substituting the word "and" for "or."

While we agree with the court in the *Kennerly case*

that the act deals with work that is regarded as particularly hazardous, and that its purpose is to reduce the hazard to the fullest possible extent, the recognition of this purpose cannot justify deleting unambiguous words from the statute. Nor are we obliged to do so because our legislature in 1959 refused to amend the Scaffold Act so as to abrogate the interpretation in the *Kennerly case*. The action or inaction of the legislature in 1959 is hardly conclusive of the legislative intent in enacting a statute in 1907.

We also realize that under our view, the Scaffold Act may not always afford an injured party a remedy in addition to workmen's compensation. Since the Scaffold Act was enacted prior to the Workmen's Compensation Act, it is obviously not designed to provide any such additional remedy, and any lessening of the effectiveness of the Scaffold Act is due, not to our construction of it, but to the provision in the Workmen's Compensation Act making it the exclusive remedy against the employer. It is not the province of this court to distort the Scaffold Act in order to insure double remedy, and authorize by indirection what the Workmen's Compensation Act prohibits by a direct action. See *Moroni* v. *Intrusion-Prepakt, Inc.* (1960), 24 Ill. App.2d 534.

However, our interpretation certainly would not repeal the Scaffold Act as a civil remedy, as plaintiff suggests. Any employee or other person injured by a wilful violation of the act by any of the enumerated persons having charge of the structural work still has an action against such party. This is a very real remedy, when we consider that structural work frequently involves the operations of several contractors or subcontractors who are each in charge of a phase of the work, and the injured person has a right of action against any one of them, other than his employer, who may wilfully violate or fail to comply with the act. *Fetterman* v. *Production Steel Co.* (1954), 4 Ill. App. 2d 403; *Gundich* v. *Emerson-Comstock Co.* 21 Ill.2d 117.

We must determine next whether civil liability can be imposed upon defendant under our interpretation of section 9 of the Scaffold Act. The record shows that plaintiff was injured when the ladder on which he was climbing to the scaffold slipped because it was placed on a patch of ice and slush on the concrete floor of the structure, and had not been nailed to the scaffold in accordance with the custom in the trade. Therefore, there could be deemed to be some evidence of failure to comply with that portion of section 1 of the act specifying that all ladders used in the erection of any structure shall be so erected, placed and operated as to give proper and adequate protection to the life and limb of any person employed or engaged thereon. However, before civil liability may be imposed upon the defendant owner under section 9 of the act, it must appear that he had charge of the construction operations involving the violation.

It is undisputed that the engineering and architectural plans for the work were prepared by the office of the chief architect of the defendant railroad, and that he and other personnel made frequent inspections of the construction project, spending as much as five hours a day on the premises on occasions. It is not clear from the evidence just how detailed those inspections were. It is also undisputed that the bricklaying, assembling and construction of scaffolds, and the placement of ladders were performed by the employees of the Marhoefer Company, and under their supervision. Under these circumstances, it was at most a disputed question of fact whether the owner could be deemed to be in charge of the construction within the meaning of the act, and it would be the province of the jury, under proper instructions, to make that determination. While the jury herein did find that plaintiff was entitled to recover, the Appellate Court in weighing that evidence held that it did not establish liability. On review, this court is precluded under section

92(3)(b) of the Civil Practice Act (Ill. Rev. Stat. 1959, chap. 110, par. 92(3)(b),) from reweighing that evidence and substituting its judgment on such a question of fact.

It appears further, however, that although the Appellate Court remanded the cause for a new trial, plaintiff moved to strike that remanding order on the assumption that the Appellate Court erred in construing the Scaffold Act under the *Kennerly case* and under our prior decision in *Gannon* v. *Chicago, Milwaukee, St. Paul and Pacfiic Railway Co.* 13 Ill.2d 460, 462. We held in the earlier *Gannon case* that workmen's compensation is the injured employee's exclusive remedy against his employer. It was noted by way of *dictum* that an action under the Scaffold Act could be maintained by the injured party against the owner of the premises. However, there was no discussion in that case of the nature of the owner's liability.

Nevertheless, plaintiff argues that this court should follow the course taken in the *Molitor case* (*Molitor* v. *Kaneland Community Unit Dist.* 18 Ill.2d 11 and hold that our interpretation of the law shall be prospective in operation and not affect plaintiff's action. In the *Molitor case* the rule of law expounded in the opinion was held applicable only to the plaintiff therein and to future plaintiffs because of the overwhelming financial hardship to school districts whose sovereign immunity was uprooted, and who would otherwise be subjected retroactively to liability in hundreds of cases. In the instant case our interpretation of the Scaffold Act imposes no hitherto unrecognized liability on anyone; hence, there is no basis for following the court in the *Molitor case* and invoking the "Sunburst Doctrine."

While we recognize that no one has a vested right in any decision (*Spiegel's House Furnishing Co.* v. *Industrial Com.* 228 Ill. 422), we are not insensitive to the possible hardship upon plaintiff in proceeding with this litigation, apparently in reliance upon the *Kennerly case* and the unqualified *dictum* in the earlier *Gannon case*. Therefore,

pursuant to section 92(1)(e) of the Civil Practice Act, authorizing a reviewing court to grant any relief, including remandment, that the case may require, we shall follow the course taken in *Petty* v. *Illinois Central Railroad Co.* (11 Ill. 2d 485, 489), and direct that the remanding order be reinstated so that plaintiff will have an opportunity to properly try his case in the light of the interpretation of the law set forth herein.

*Cause remanded, with directions.*

Mr. JUSTICE HERSHEY dissenting:

I think our decision in *Kennerly* v. *Shell Oil Company,* 13 Ill.2d 431, was correct and should be regarded as decisive of the issue in this case. However, even if I were fully persuaded that we had reached an erroneous result in the *Kennerly case,* I would still be most reluctant, under the present circumstances, to overrule our previous decision. It seems to me that the reasons favoring an adherence to the doctrine of *stare decisis* are even more compelling in cases involving the construction of a statute than in those applying a rule of the common law. In the latter situation, there may be an occasional instance where a court, convinced that a particular rule of law should never have been enunciated or has outlived its usefulness, will overrule one of its prior decisions. In such a case, the departure from the doctrine of *stare decisis* is rationalized on the theory that, since the court was responsible for creating the rule of law, it may also properly assume the responsibility for abandoning or changing the rule. But when a statute is being construed, the rule of law is not the creation of the court; rather, the court is seeking to discover and give effect to the intention of the legislature. A judicial construction of a statute by the highest court of the State becomes, in effect, a part of the statute itself. Therefore, any subsequent change in the law is peculiarly within the province of the legislature. Moreover, the General Assembly, meeting in

1959, had before it three different bills, each of which sought to amend the statute as construed by us in the *Kennerly case*. Each of these bills failed of passage. Thus, not only does the majority opinion indulge in judicial legislation, but it is legislating about a matter which the legislature itself has recently considered and upon which it refused to legislate. Judicial legislation, which, in my opinion, is rarely justified, is completely unwarranted in this case.

Mr. CHIEF JUSTICE SCHAEFER concurs in this dissent.