Mabel J. SKINNER, individually, and Phillip C. Skinner, by his Mother and Next Friend, Mabel J. Skinner, and Kenneth D. Skinner, by his Mother and Next Friend, Mabel J. Skinner, and Mabel J. Skinner, as Administratrix of the Estate of Phillip Skinner, Deceased, Plaintiffs,

and

Edward C. Simon Painting Co., Inc., Intervenor,

v.

UNITED STATES of America, Defendant and Third-Party Plaintiff,

v.

ED. GEIGER CONSTRUCTION COMPANY, Inc., and Edward C. Simon Painting Company, Inc., Third-Party Defendants.

Civ. No. 4667.

United States District Court
E. D. Illinois.

Sept. 28, 1962.

Edward J. Murphy, East St. Louis, Ill., for plaintiffs.

Robert R. Schwarz, St. Louis, Mo., and Wayne P. Williams, East St. Louis, Ill., for intervenor and third-party defendant, Edward C. Simon Painting Co., Inc.

Carl W. Feickert, U. S. Atty., East St. Louis, Ill., Howard F. Boman, of Oehmke, Dunham & Boman, East St. Louis, Ill., and Dreman & Sterling, Belleville, Ill., for third-party defendant, Ed. Geiger Const. Co., Inc.

JUERGENS, District Judge.

This is a civil suit against the United States of America, arising under the provisions of Section 2674, Title 28 U.S.C. A. (Federal Tort Claims Act).

Civil Causes Nos. 4264 and 4667 were consolidated and proceeded to trial as No. 4667.

The complaint in Civil No. 4667 seeks recovery from the defendant, United States of America, on three counts.

In Count I recovery is sought under Sections 60–69 of Chapter 48, Illinois Revised Statutes 1957, the Structural Work Act (commonly called the "Scaffold Act") of the State of Illinois, and is a death action brought by the widow and heirs of the decedent, Phillip Skinner.

By Count II the administratrix of the estate of Phillip Skinner, deceased, brings a survival action under the Scaffold Act.

Count III is an action by the administratrix under the Wrongful Death Statute of the State of Illinois.

There is also an intervention complaint, filed by the Edward C. Simon Painting Company, Inc. (hereinafter sometimes referred to as "Simon"), wherein recovery is prayed against the United States for payments for medical expenses under the Workmen's Compensation Act in the amount of $13,460.25 and for payments of compensation under the Illinois Workmen's Compensation Act in the amount of $3,906.00.

The United States previously filed a third-party complaint, which was subsequently amended, against the Ed. Geiger Construction Company, Inc., and the Edward C. Simon Painting Company, Inc., as third-party defendants. This latter

complaint, however, was dismissed for failure to state a cause of action.

The accident out of which this cause arises occurred at a building located on Scott Air Force Base, known as Building S–35, which was a hangar used for housing airplanes. The building was located in a restricted area and was entirely fenced, with entrance permitted only to certain authorized personnel. Decedent, Phillip Skinner, was an employee of the Edward C. Simon Painting Company, Inc., a painting subcontractor of Ed. Geiger Construction Company, Inc., the prime contractor, who had a contract with the United States to perform certain work at Scott Air Force Base.

The Edward C. Simon Painting Company, Inc., was in the process of painting certain hangar doors on Building S–35.

In pursuing this work, ladders were placed against the hangar doors and the painters, one of whom was Phillip Skinner, the deceased, would ascend these ladders. The doors were so constructed that when opened they would fold back into a well in the building. These were electrically operated doors and could be placed in operation only by operating switches located inside the hangar. At the trial it was stipulated that the control and movement of the doors at the hangar were exclusively within the control of the Air Force Personnel and that no other persons had, or were permitted to have, any control over the operation thereof.

In the hangar in question there were two doors, commonly referred to as the "north" door and the "south" door, each of which were divided into seven panels, and each door was approximately 50 feet wide and 30 feet high. There was a switch to control each of the doors.

Clarence B. Wellen, a foreman for Simon, testified that they began painting the large doors in front of the hangar about a week before the accident; that before beginning the work he told Sergeant Allard, the assistant hangar chief, that they would be painting the doors and it was imperative that the doors be made completely safe so that they could not be moved; that in furtherance thereof he and Sergeant Allard first positioned the doors for painting and they then went to the fuse box, which was located in the well of the door involved, and Sergeant Allard removed the fuses from the fuse box; that they then proceeded to the other door well and Sergeant Allard removed fuses from that fuse box, thus assuring that it was not possible for anyone to press the control switches and move the doors by accident; that this procedure was followed up to the time of the accident on September 22, 1958; that on the morning in question Sergeant Allard was not present at the hangar and he contacted Sergeant Lamkin, the hangar chief; that on the morning in question he discussed positioning of the doors with Sergeant Lamkin and asked if he was familiar with the operation and the sergeant assured him he was; that at all times previous when it became necessary to operate the doors, whether for original positioning or for changing positions in order to better pursue the painting work after the doors had been placed in the proper position, the sergeant would remove the fuses and, as they were removed, would either hold them up so they could be seen or would wave it was all clear; that on the morning of the accident the painters arrived at the scene and, after he contacted Sergeant Lamkin, the sergeant went to the switch box and positioned the doors as desired; that he then observed him go to the fuse box, after which the sergeant waved an all clear; that he then instructed the painters to proceed; that the painters had proceeded up the ladders and were just commencing work when suddenly the hangar door against which their ladders were mounted began to move; that someone yelled, "Stop the doors!"; that the doors stopped momentarily but then proceeded to move and, as they did, caused the ladders to fall.

Frank Abramovich testified he was working on the doors with the decedent, Phillip Skinner; that neither he nor the decedent ever had anything to do with operating the doors; that on the morning of the accident he and Skinner started to work about 8:00 o'clock; that Wellen was in the area of the hangar and gave them the okay to get on the ladders and begin to paint; that he and Skinner set up their equipment and started up the ladders at approximately 8:15; that after having painted but a short time the doors suddenly moved; that he yelled, "Stop the doors!"; that the doors momentarily stopped and then they started again; that after the doors moved the second time his ladder and Skinner's ladder began to move, causing him and Skinner to fall to the ground. He further testified that rolling scaffolds could have been used for this particular painting job, which would not have utilized the doors as support. He also testified that 40 foot ladders could have been used and in such event it would not be necessary to place the ladders against the hangar door since it would be possible to reach above the doors. He did testify, however, it would have been difficult to paint from the 40 foot ladders.

On cross-examination this witness stated he did not know if the foreman, Wellen, had said it was safe to proceed with the painting but that he did seem to recall that Wellen had waved his hand and that he just doesn't remember too much.

Sergeant Allard testified that Wellen contacted him when the painters first came on the job; that he and Wellen went to the switch box the first time; that he took out the fuses and told Wellen he would have to take out the fuses on the other end of the building also; that at each time thereafter, when he was required to move or operate the doors, he always took out the fuses and either showed them to Wellen or told him it was okay; that when it was necessary to move the doors, they always came to him; that only one or two other non-coms. were permitted to move the doors; that it generally took two to three minutes to close the doors and, after they were closed and secured, he would notify Wellen to proceed; that he did not operate the doors on the day of the accident and had never placed a sign on the switch.

Sergeant Lamkin testified he was in charge of the hangar but that he was not present the week previous to the accident when the painting was going on; that on the morning of the accident he was advised that the painters wanted to paint the doors and he was requested to position them; that he positioned the doors by operating switches located on the south side of the hangar; that thereafter he proceeded to a fuse box located in the door well on the south side of the hangar, which controlled the fusing system to the south door. He testified that he removed one fuse from the box but could not say whether he removed any others; that he proceeded from the door well to a small room adjoining the switches; that he looked around for and found a piece of cardboard, approximately 8½ inches by 11 inches, and wrote on it "Do not operate. Painters painting."; that he obtained another sergeant to help him affix the sign to the switches which operate the north door, which he had positioned and upon which the painters were to paint; that he took the sign and bent it around the switch box and secured it with tape to the top; that when he finished he turned to go across the hangar and, when he had proceeded but a few feet, someone yelled, "Stop the doors!"; that he then noticed the doors moving; that he turned and reached up to the sign and hit what he thought to be the stop button but the door did not stop; that he then ripped off the sign and pushed the stop button and the door stopped moving.

It was stipulated that the deceased met his death as a result of the injuries received in the fall from the ladder on September 22, 1958, although his death did not occur until July 2, 1960. It was also stipulated that the operation of the

doors was exclusively within the control of Air Force personnel.

Mabel Skinner, widow of the decedent, testified that she and decedent had two boys, ages 15 and 18 at the time of the trial; that her husband had earned approximately $125.00 to $130.00 per week; that he would cash his check and give the money to her, except about $10.00 which he used for himself; that he was in pain most of the time and that he wore a back brace and neck brace; that he was not able to walk very well; that she usually served him in bed but that he ate at the table once or twice a week; that he could not get up and down without help. She testified that Phillip Skinner was born on October 19, 1922, and was 37 years of age at the time of his death; that from approximately the year 1945 to the date of the accident he had been a painter and had never been hospitalized prior to the date of the injury and had generally worked steadily; that his health was generally good; that he belonged to the painters' union in East St. Louis.

Decedent's income tax return for the year 1957 was introduced into evidence, which showed that decedent earned $5,176.61 during 1957. The decedent's 1958 income tax return, which covered the period beginning January 1, 1958 and ending September 22, 1958, showed earnings of $4,166.94. The evidence was that workmen's compensation in the amount of $3,906.00 was paid to the decedent and $13,460.25 had been incurred in medical expenses, all of which was paid by the intervenor, Edward C. Simon Painting Company, Inc.

The questions the court must decide are whether or not the plaintiff Mabel J. Skinner and her two sons, as heirs of Phillip Skinner, may recover under the provisions of the "Scaffold Act" and whether or not the administratrix of the estate of the decedent may collect lost wages, medical expenses and for pain and suffering from the date of his injuries until his death and whether or not the administratrix is entitled to recover under the Illinois Wrongful Death Act and if the plaintiffs are entitled to recover, the amount of damages; and, in the event the plaintiffs are entitled to recover, the court must determine the right of the intervening petitioner.

It is beyond dispute that the decedent, Phillip Skinner, was on a ladder which was being supported by the hangar doors; that the doors moved, causing him to fall; that he received injuries from which he subsequently died. It is stipulated that the United States was in control of the doors, and all of the evidence shows that the defendant, United States, was the only one who had control of the doors.

 The test established by the Tort Claims Act for determining the liability of the United States is whether a private person would be responsible for similar negligence under the laws of the state where the acts occurred. Rayonier, Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354. Therefore, if under the circumstances presented in this case, a private person would be liable, then the United States would likewise be liable.

The "Scaffold Act" (Structural Work Act), Chapter 48, Sections 60–69, Illinois Revised Statutes 1957, provides as follows:

"AN ACT providing for the protection and safety of persons in and about the construction, repairing, alteration, or removal of buildings, bridges, viaducts, and other structures, and to provide for the enforcement thereof."

Section 60 provides as follows:

" * * * all scaffolds, hoists, cranes, stays, ladders, supports, or other mechanical contrivances, erected or constructed by any person, firm or corporation in this State for the use in the erection, repairing, alteration, removal or painting of any house, building, bridge, viaduct, or other structure, shall be erected and constructed, in a safe, suitable and proper manner, and shall be so erected and con-

structed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon, or passing under or by the same, and in such manner as to prevent the falling of any material that may be used or deposited thereon. * * * "

Section 69 provides as follows:

" * * * Any owner, contractor, sub-contractor, foreman or other person having charge of the erection, construction, repairing, alteration, removal or painting of any building, bridge, viaduct or other structure within the provisions of this act, shall comply with all the terms thereof, and any such owner, contractor, sub-contractor, foreman or other person violating any of the provisions of this act shall upon conviction thereof be fined not less than $25, nor more than $500 or imprisoned for not less than three months nor more than two years or both fined and imprisoned in the discretion of the court.

* * * * * *

"For any injury to person or property, occasioned by any wilful violations of this act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured, for any direct damages sustained thereby; and in case of loss of life by reason of such wilful violation or wilful failure as aforesaid, a right of action shall accrue to the widow of the person so killed, his lineal heirs or adopted children, or to any other person or persons who were, before such loss of life, dependent for support on the person or persons so killed, for a like recovery of damages for the injuries sustained by reason of such loss of life or lives."

The history of the "Scaffold Act" of the State of Illinois, as interpreted by the state courts, has been a stormy one, ranging from absolute non-delegable lia-

bility on the part of an owner for a defective scaffold on his premises to liability of an owner only when he is in control of the work being performed on his premises.

Liability under the Scaffold Act, as it has most recently been interpreted by the Illinois Supreme Court, is set forth in Gannon v. Chicago, Milwaukee, St. Paul & Pac. Ry. Co., 22 Ill.2d 305, 175 N.E.2d 785. In Gannon the engineering and architectural plans for the work were prepared by the railroad's architect, who was charged with inspecting the work to see that it was constructed according to the specifications. All of the construction work, however, including the bricklaying, assembling and constructing of the scaffolds and other operations, was done by E. H. Marhoefer & Co. and its employees under a contract with the railroad; and although the railroad architect and engineers made frequent inspections of the structural activities, there was no inspection of the scaffolds or ladders or other appliances at any time and they exercised no control over the manner in which the work was done, nor does it appear that the railroad had any control over the scaffold. The court held that under the circumstances presented it was at most a disputed question of fact whether the owner could be deemed to be in charge of the construction within the meaning of the Act and it would be the province of the jury, under proper instructions, to make that determination.

The language of the statute is mandatory and imperative that the scaffold shall be so constructed as to be safe and afford adequate protection to the persons working thereon, and the employer cannot escape liability for a wilful violation of the statute when he constructs an insufficient, unsafe and dangerous scaffold, even though he may have believed the scaffold not to be dangerous. Schultz v. Henry Ericsson Company, 264 Ill. 156, 106 N.E. 236. The court further said in the Schultz case that "wilfully" is synonymous with "knowingly" and to constitute a wilful

violation of the statute it is not necessary that there should have been "reckless disregard" of the statutory provisions.

■ In the instant case it does not appear that the United States was in charge of the painting of the hangar doors. However, the United States was in charge of the hangar doors, which in this instance were used as a base against which the ladders were placed and, as such, became an integral part of a scaffold upon which the painters were working. Thus, although the United States might not have been technically in charge of the painting, yet it was in complete charge of the scaffold to the extent that it, and only it, was permitted to operate the doors against which the ladders were placed. Both the United States, through its agents, and Simon, through its agents, were fully aware that there existed a dangerous condition as a result of the ladders being placed against the doors and the ability of the doors to move unless proper precautions were taken to prevent such movement. Notwithstanding this knowledge, the hangar doors which were a vital part of the scaffold were permitted to remain in an operating condition and thereby created a dangerous situation. A more defective scaffold can hardly be imagined.

The court finds that the United States was in charge of the work to be performed as that term is used in the Scaffolding Act. It further finds that the United States, through its agents, knowingly permitted the hazardous condition to exist and in so doing comes within the provisions of the Scaffolding Act.

■ The court also finds that the intervenor, Edward C. Simon Painting Company, Inc., knew that the placement of the ladder against a movable door constituted an unsafe condition and should have provided a type of scaffold which was suitable for the use. This it failed to do. A suitable scaffold was available and could have been used in lieu of the ladders which were utilized in the performance of the work.

The court finds that the Edward C. Simon Painting Company, Inc., was negligent in not providing a safe and suitable scaffold for use by the painters.

The court further finds that the United States is liable for the losses suffered by the decedent during his lifetime and to his widow and heirs for any and all damages they may have suffered as a result of his death.

Having found that there is liability under the Scaffolding Act and that damages suffered thereunder are payable under the provisions of the Scaffolding Act, it is unnecessary for the court to determine whether or not the administratrix might have been able to recover under the Illinois Wrongful Death Act, as full compensation may be awarded under the Scaffolding Act. A plaintiff is entitled to only one satisfaction.

The court, having found the intervenor guilty of violating the Scaffolding Act through its negligence in not providing a proper scaffold, accordingly finds that it is not entitled to recover on its intervening petition.

■ There remains for consideration the amount of damages to be awarded to the plaintiffs.

Phillip Skinner would have earned approximately $9,719.00 between the date of injury and his death, had he been able to work. He received workmen's compensation in the amount of $3,906.00. Thus, he lost approximately $5,813.00 in earnings by virtue of his inability to work.

Phillip Skinner was approximately 37 years of age at the time of his death. He was a painter. His salary for the year 1957 was $5,176.61 and from January 1 to the date of his injury on September 22, 1958, he earned $4,166.94.

The evidence established that painters received approximately a 10 per cent increase in wages between the date of injury and the time of trial.

It is reasonable to assume that he would have earned approximately $5,555.92 if he had worked the full year in 1958. It is also reasonable to assume

he would have earned at least an equal amount for 1959, 1960 and 1961. It is also reasonable to assume, based on the evidence of increased earnings of painters, that he would have earned approximately $5,695.00 in 1962 and that he would have received a like amount each year thereafter during his working life, which the court believes would continue to the age 65.

The court finds that his widow and heirs have been damaged in the amount of income he would probably have provided to them during his working life or for a period of 28 years.

As has been stated, Phillip Skinner would have earned $5,813.00 from the date of his injury to the date of his death except for the injury.

His widow testified that he retained approximately $10.00 a week. The evidence did not establish the amount of income which, although given to his wife, would have been utilized by him in providing for his food, lodging, clothing, transportation, recreation, etc. It is reasonable to assume that a man employed as was Phillip Skinner would have utilized 40 per cent of his earnings, leaving the remaining 60 per cent for the exclusive use of his wife and two children during the minority of the children.

At the time of his death Phillip Skinner left two sons as his only children and heirs-at-law, him surviving, who were 16 and 13 years of age respectively.

He would have provided approximately 60 per cent of his earnings for the care and support of his wife and minor child or children for approximately 8 years. The court also finds that he would have utilized approximately 60 per cent of his earnings after the youngest child attained legal age.

In order to determine the amount of loss suffered by the next of kin of the decedent, the court added 5 per cent to the amount of support he would have provided for the years prior to trial, and for each year thereafter there has been deducted an amount equal to 5 per cent

per annum of the amount he would have contributed had he lived. The court finds that the total amount of earnings he would have contributed to his family in the 28 working years is $40,633.00.

His burial expense was $829.00.

There was no testimony tending to show whether or not the decedent performed chores around the home for his wife or that he was mindful of his children and assisted in providing instructions and guidance for them.

The evidence concerning pain and suffering was very meager. However, considering that meager evidence, the court finds that a reasonable amount to be awarded for pain and suffering of the decedent from the date of injury until his death is $5,000.00.

The evidence showed that he incurred medical expenses in the amount of $13,460.25. This amount, however, was paid by someone other than the decedent, or his widow, or his heirs, and, therefore, may not be considered as damages to the decedent, or his administratrix, or his heirs.

The court is aware that many of the statements herein have been made on assumptions; but the testimony as to what the decedent did during his lifetime, insofar as his home chores were concerned and insofar as to what he did with the money which he withheld from his paycheck, is extremely meager.

The court finds that the administratrix of the estate of Phillip Skinner, deceased, should be awarded an amount equal to the wages deceased would have earned from the date of injury to the date of death (less workmen's compensation he received), the amount of the funeral bill and interest on both of said amounts at the rate of 5 per cent per annum from the date of death to the date of judgment. This amount is $12,946.-54.

The court further finds that $33,193.-00 should be awarded to Mabel J. Skinner, as the widow of Phillip Skinner; that $3,000.00 should be awarded to the eldest son of the decedent; and that

$4,440.00 should be awarded the youngest son of the decedent—or $40,633.00 in the aggregate.

Judgment in the amount of $12,946.54 should be entered in favor of Mabel J. Skinner, administratrix of the estate of Phillip Skinner, deceased, and against the United States of America.

Judgment should be entered against the United States of America in favor of Mabel J. Skinner in the amount of $33,193.00, in favor of the eldest son of Phillip Skinner in the amount of $3,000.00, and in favor of the youngest son of Phillip Skinner in the amount of $4,440.00.

The above and foregoing are to be considered as findings of fact and conclusions of law.

Parties to settle the order.