SHELL OIL COMPANY, a Corporation,
Plaintiff,

v.

FOSTER–WHEELER CORPORATION, a
Corporation, Defendant.

Civ. A. No. 4342.

United States District Court
E. D. Illinois.

Sept. 26, 1962.

932

Oehmke, Dunham & Boman, East St. Louis, Ill., for plaintiff.

Wagner, Conner, Ferguson, Bertrand & Baker, Belleville, Ill., for defendant.

JUERGENS, District Judge.

This suit is the aftermath of one filed in the Circuit Court of St. Clair County, Illinois; there tried to conclusion with an appeal to the Supreme Court of the State of Illinois, which affirmed.

The judge of this court, then a judge of the Third Judicial Circuit of the State of Illinois, heard the pretrial motions in the original case entitled "Golden Kennerly v. Shell Oil Company," Cause No. 3457. The trial was before another judge.

The parties to the present suit stipulated and agreed that the copies of the amended complaint, the answer and the

reply thereto, attached to the answer of Foster-Wheeler Corporation, are true and correct copies of the amended complaint filed by Golden Kennerly v. Shell Oil Company in the Circuit Court of St. Clair County, Illinois in Cause No. 3457, of the answer of Shell Oil Company to the amended complaint, and of the plaintiff's reply thereto. They also stipulated and agreed that copies of the instructions, verdict and judgment, attached to the stipulations, are true and correct copies of the original instructions offered, given and refused at the trial, of the verdict of the jury and the judgment of the court. They further stipulated and agreed that the copy of the transcript of the evidence and testimony, attached to said stipulation, constitutes a full and complete transcript of the proceedings at the trial of the action brought by Golden Kennerly, deleting and excluding therefrom evidence and testimony concerning the injuries and damages sustained by Kennerly and the medical testimony with respect to treatment rendered to him. They further stipulated and agreed that defendant's exhibit 1, being a photostatic copy of the contract between Shell and Foster-Wheeler for the construction work being done at the time Kennerly was injured, may be used by the court in the determination of this case.

The parties further stipulated and agreed that all of the above encompasses all of the evidence necessary to a decision in this case except as to the amount of plaintiff's recovery and no factual dispute is involved between plaintiff and defendant relative to the evidence to be considered in this case on the question of liability herein. They further stipulated that the only question is whether or not the plaintiff is entitled to recover in this proceeding against the defendant and, if so, the amount of damages to be awarded.

The instant complaint and amendment thereto allege that the action by Kennerly in 3457 was predicated on a claimed violation of the Structural Work Act (Illinois Revised Statutes, 1957, Chapter 48, paragraphs 60–69); that the evidence showed that Kennerly was an employee of Foster-Wheeler Corporation, which had a contract as general contractor with Shell to construct and erect a distillation unit at Shell's Wood River, Madison County, Illinois refinery; that Kennerly fell from a scaffold and received various serious and permanent injuries; that Foster-Wheeler was careless and negligent in the erection of the scaffold and that such negligence was the proximate cause of the injuries to Kennerly; that the verdict of the jury and judgment of the court were based on the evidence that the scaffold was not erected in a safe, suitable and proper manner as required by the statute; that on May 23, 1958 the decision of the Supreme Court of Illinois, affirming the judgment of the Circuit Court of St. Clair County, Illinois, became final and thereafter Shell paid the judgment with interest thereon in the aggregate amount of $85,020.83 plus costs; that no part of this amount has been repaid to the plaintiff by the defendant herein or by any other person, firm or corporation in its behalf.

The complaint and the amendment thereto further allege that the injury to Kennerly was produced solely through negligence on the part of the defendant and through no negligence on the part of the plaintiff; that a carpenter of defendant built the scaffold with lumber furnished by the defendant; and that Kennerly was an employee of the defendant and no employee of Shell when the incident occurred. Plaintiff further alleges that it had no control over the materials used in the scaffolds or the employees working thereon—all of which were under the control of the defendant. Plaintiff further alleges that Foster-Wheeler was primarily negligent and that it should be reimbursed for the expenditures made by it to Kennerly in the original case.

Foster-Wheeler has filed its answer, denying the material allegations of the complaint and amendment thereto; and in its third defense alleges that Shell

failed to comply with the Act; that Shell was the owner and that the buildings were jointly occupied and controlled by Shell and Foster-Wheeler; that Foster-Wheeler was controlled and directed by Shell; that the effect of the general verdict was to find Shell guilty of all charges made in the amended complaint; that the charges made by Shell in the instant case are the same charges made against Shell by Kennerly; and that Shell was a joint tort-feasor.

By its fourth defense it alleges that Kennerly's amended complaint charged Shell as being the owner, jointly occupying the building with Foster-Wheeler and controlling and directing the construction thereof; that the effect of the general verdict was to find Shell guilty of all charges; that Shell had actual knowledge that the scaffold was defective; and that the effect of the verdict was finding Shell guilty of active negligence.

The fifth defense alleges that Kennerly's amended complaint charges Shell with willfully and knowingly failing to comply with the Act and jointly occupying and controlling the building with Foster-Wheeler; that the effect of the general verdict was to find Shell guilty of all charges; that the jury had evidence that Kennerly informed Shell that the scaffold was dangerous; and that the verdict was in effect finding Shell guilty of active negligence.

By its sixth defense the defendant says that Kennerly's amended complaint charges that Shell failed to comply with the Act and jointly occupied and controlled the building with Foster-Wheeler and Foster-Wheeler was controlled by Shell; that the effect of the general verdict was to find Shell guilty of all charges; that the Act imposed a nondelegable duty upon the owner and grants no right of indemnity or subrogation or contribution.

By its seventh defense it alleges that Kennerly was an employee of Foster-Wheeler, both of whom were bound by the Illinois Workmen's Compensation Act; that the injury arose with, of and in the course of his employ with Foster-Wheeler; that Foster-Wheeler has discharged its obligation under the Illinois Workmen's Compensation Act; that the Illinois Workmen's Compensation Act prohibits a common law or statutory right of action by Kennerly against Foster-Wheeler; and that Shell has no cause of action against Foster-Wheeler for any liability over and beyond the liability of Foster-Wheeler.

The accuracy of all the pleadings, the testimony (excluding medical), the instructions, verdict and judgment has been stipulated by the parties. Both parties have moved for summary judgment. A legal question only is involved.

The copy of the transcript of the evidence, attached to the motion of Foster-Wheeler for summary judgment, having been stipulated to as constituting a full and complete transcript of the proceedings of the trial of the original action, deleting and excluding therefrom evidence and testimony concerning the injuries and damages sustained by Kennerly and the medical testimony with respect to treatment rendered to him therefor, authorizes this court to rely thereon for its decision.

For a proper and full consideration of this case it is deemed advisable to briefly set forth the testimony of the various witnesses in Kennerly v. Shell.

Everett Turner, a welding foreman for Foster-Wheeler, testified that Foster-Wheeler was putting up a new distilling unit on the Shell property; that the scaffold was built on the day of the accident; that several other subcontractors had employees in the area, including one or two inspectors from Shell's inspection department; that Shell's protection department (who were watchmen) was daily "making the rounds"; that the inspection department was there to inspect materials and workmen doing the welding and they calipered all fittings, namely, the pipe and valve fittings and also inspected the welding work and type of material; that Mr. Lambert of Shell was the construction engineer who checked with Foster-Wheeler; that some-

one from the engineering office periodically would come in and check progress of the work and blueprints; that revisions were made by Shell on the blueprints as work progressed; that "our men" would put tests on the pipes and the inspection department would okay; that "we" had a Shell and a Foster-Wheeler badge; that Shell gave "us" a mimeographed sheet of rules (Rules for Contractors' Employees); that the protection department and the safety department enforced smoking and rules "the like of that"; that smoking rules were enforced; that if violations were encountered, they were reported to the office and Foster-Wheeler would terminate the employment; that "Shell inspection department would inform Foster-Wheeler when we were wrong and come back to us."

On cross-examination he testified that his pay check came from Foster-Wheeler; that he was not an employee of Shell; that Shell enforced smoking rules; and that Shell watchmen or policemen would report smoking regardless of whether it was Shell or Foster-Wheeler men. He further testified that weld testing was provided for in the plans and specifications; that if Shell found a leak it would tell "us" and Foster-Wheeler; that Foster-Wheeler carpenters built the platform; that none of Shell's carpenters ever worked on that scaffold.

On redirect-examination he testified that ever so often the payroll of the job was checked and when the Foster-Wheeler paymaster came around, a representative of Shell was with him to check the individual receiving his paycheck.

Miles Tolliver testified that on April 7, 1953 he was working for Foster-Wheeler as a steamfitter on the property of Shell; that he was on the patented scaffold that Kennerly had worked on; that Shell inspectors would come around when a weld was finished; that he would see watchmen several times each day; that a Shell representative would check the badge numbers when they were paid. On cross-examination he testified that the badge numbers were checked to see if the man who had the badge was drawing the right pay; that Foster-Wheeler paid him; that all the men working up around the platform were Foster-Wheeler employees; that Foster-Wheeler men built the scaffold and no Shell man worked on it.

Raymond S. Logan testified that on April 7, 1953 he was a Foster-Wheeler foreman, putting up part of a distilling unit for Shell; that Mark Lambert was construction superintendent for Shell; that he saw him around the job and that "he would be just generally looking the job over"; that Mr. Hanson, an engineer under Lambert, was there practically every day; that a man from the auditing department once a month would distribute checks; that he would see Shell's inspectors or safety men in and around the job; that Shell usually had a man present while the welders took the test; that Shell Oil Company employment office issued a set of rules before they went on the job.

He further testified that Shell's engineer sometimes told him to make changes and other times "it would go back to the boss of Foster Wheeler"; that some chrome alloy pipe was badly bruised in shipment and Shell's inspectors made them build it up before they let them erect it; that Shell inspected the work and it would not be accepted until proper; that Shell inspectors examined the welds; that a Shell watchman took out some "banned men"; that the company watchmen made the rounds generally over all the plant; that "they had up past 400 acres of ground"; that if a watchman caught him smoking, "I don't know who he would report me to."

Lester Strader testified that on April 7, 1953, he was working for Foster-Wheeler, fitting pipe at the Shell plant; that there were quite a few other outfits who also were working on the job. On cross-examination he testified that Foster-Wheeler carpenters built the scaffold.

Mark L. Lambert, called by the plaintiff as an adverse witness under Section 60, Chapter 110, Illinois Revised Statutes, testified he was construction su-

perintendent of Shell Oil Company; that on April 7, 1953 he had charge of all construction work in the refinery at Shell Oil Company at Wood River, Illinois; that he did not, nor did any Shell Oil Company employee, ever make any inspections or issue any orders with reference to the building of the scaffold or erecting it in a safe and suitable manner; that he only asked that scaffolds be erected.

Golden Kennerly, testifying in his own behalf, said that on April 7, 1953 he was a steamfitter-welder employed by Foster-Wheeler Corporation on construction at Shell Oil Company premises at Wood River, Illinois, working on a new distilling unit they were building; that he told inspector Thompson of Shell that the scaffold was defective and had no hand rail; that Thompson replied, "There is nothing I can do about it."; that there were Shell employees working around the job at the same time; that he got a set of rules; that Shell uniform watchmen took a man off the premises (on cross-examination he said for drinking purposes).

On cross-examination Kinnerly testified that on April 7, 1953 he had been working for Foster-Wheeler for about a year; that he was not employed by Shell Oil in any way and had never been employed by Shell; that a Foster-Wheeler carpenter made the scaffold from which he fell; that he was not a Shell carpenter; that Everett Turner was his foreman; that Thompson was an inspector of welds; that he did not say a word to Turner, who worked with him on the scaffold, that it was dangerous; that he talked to no one else from Shell about the scaffold; that Shell watchmen were enforcing the rules on all men working on the premises against drinking and smoking; that Liberty Mutual Insurance Company paid his doctor and hospital bills on behalf of Foster-Wheeler.

Mark Lambert, for the defendant, testified he was construction superintendent of Shell Oil Company's plant at Wood River, Illinois, which covers approximately three sections of land, about 1928 acres; that he had been with them for twenty-six years; that the work being done was on a guaranteed maximum contract of $6,000,000; that Foster-Wheeler gave Shell a fixed sum and any saving below that figure was to be divided 75% to Foster-Wheeler and 25% to Shell; that it was to Shell's interest to see that the costs were kept down; that checks were made on the badges of the workmen in connection with saving money on the project; that Shell's treasury department would check or observe the giving out of the weekly checks of Foster-Wheeler so that there would not be any collusion or featherbedding.

He further testified that Foster-Wheeler prepared the specifications for this unit, which were submitted to and accepted by Shell; that he does not recall any changes in the specifications; that Shell did not do any of the construction work on this unit; that Shell later took possession of the unit on notice to him from Foster-Wheeler, after which they brought their people in; that in 1953 he was construction superintendent and had general supervision so far as Shell's supervision over the erection of this new distilling unit; that he had one assistant on this unit; and that he went out on the area from time to time when this unit was being built.

He further testified that Shell had rules in effect concerning smoking and drinking and other things of that kind that applied to both Shell and contractors' employees; that these rules would be carried out by their protection department, consisting of about twelve men, of which one and two part time were over this unit doing duties comparable to police; that they had no actual construction work duties; that Mr. Hanson was project engineer and Mr. Thompson was welding inspector; that they had two full time and one part time inspector on this job; that Thompson's duties did not include inspecting the building of the scaffold by Foster-Wheeler or the erection thereof; that the purpose of inspecting the welds was to get a complete

project that was tight and acceptable for operations and to see that there were no leaks; that Thompson's work required him to go in and about the new construction work where welds were being completed; that the policemen watched for smoking, drinking, fighting and any infractions of that sort; that if the inspector found something not in accord with the plans and specifications, if it was of a minor nature, he would take it up directly with Foster-Wheeler, but if it could not be corrected at the place he appealed to the resident engineer or his assistant, Mr. Hanson, or to "me." On cross-examination he testified that Shell policemen do not remove men for infractions of its rules; they report the men and infraction to the contractor employing them, who removes them at Shell's request; that Shell's men had the right under the contract to make inspection; and that he never made any attempt to inspect any scaffold on any of the jobs.

Clark Hanson, for the defendant, testified he had been working for Shell eight and one-half years and that he was working as project engineer at the time of the accident; that his principal business was to see that Foster-Wheeler built the unit according to plans and specifications; that he had nothing to do with the erection, construction or inspection of the scaffolds; that nobody at Shell had anything to do with the erection or construction of scaffolds or with their inspection after they were erected; that Mr. Thompson had nothing to do with the inspection of scaffolds or building them or anything of that nature.

Mr. Everett Turner, called by the defendant, testified he was welding foreman for Foster-Wheeler; that he was working with Kennerly when he fell on April 7, 1953; that he knew Mr. Thompson, inspector for Shell; that he was around the area; that he never heard Kennerly say to Thompson, "I don't like this scaffold; it is dangerous because the boards are not nailed down and there is no hand rail." On cross-examination he testified that Kennerly said to him be-

fore he fell that he didn't like the scaffold. On redirect he testified that any grievance that Kennerly had would be taken up with him or with his superior.

James W. Thompson, for the defendant, testified that on April 7, 1953 he was engineering inspector for Shell, inspecting welds, checking walls, thickness of pipe, etc.; that he does not recall Kennerly saying to him, "I don't like this. It is too dangerous because the boards are not nailed down and there is no hand rail or guard rail."; that he did not recall any conversation with Kennerly. On cross-examination he testified he conducted the welding tests to see that the workers were qualified workers to do the work they wanted them to do; that Shell does not inspect scaffolds.

The agreement entered into on January 25, 1951 by and between Foster-Wheeler Corporation, designated as "Contractor," and the Shell Oil Company, designated as "Purchaser," provided in paragraph "FIRST":

"The CONTRACTOR will provide mechanical design and prepare all drawings and specifications, and will furnish all labor and materials, ship, unload, deliver to site, suitably store all materials as required, construct and erect the complete 60,-000 Bbl./Day Crude Distillation Unit at PURCHASER'S Wood River, Illinois, Refinery, in accordance with the attached EXHIBIT 'C', entitled 'Description of 60,000 Bbl. Crude Distillation Unit, Wood River, Illinois Refinery, Shell Oil Co.', dated September 13, 1951 and the addendum thereto entitled EXHIBIT 'D'."

According to Article G, paragraph 4 a, b and c, the insulation was subcontracted. The Chicago Bridge was a subcontractor identified as Foster-Wheeler Purchase Order RC-576-2, and there were other subcontractors responsible to Foster-Wheeler. From a reading of the entire contract between Shell Oil and Foster-Wheeler, Foster-Wheeler was an independent contractor who guaranteed the maximum selling price of the complete

distillation unit would be $6,054,005, subject to increase or decrease according to the provisions set forth in the contract, which have no particular bearing upon the decision herein.

The Court gave two instructions at the request of the plaintiff—the first a damage instruction and the second an instruction quoting the statute as follows:

"Any owner, contractor, subcontractor, foreman or other person having charge of the erection, construction, repairing, alteration, removal or painting of any building, bridge, viaduct or other structure within the provisions of this Act, shall comply with all the terms thereof."

At defendant's request the court gave nine instructions—the first to the effect that the complaint is no evidence; the second that a corporation is entitled to the same fair trial as an individual. The third was a sympathy and prejudice instruction. The fourth was an instruction on Section 60, Chapter 48, Illinois Revised Statutes. Instruction No. 5 in effect told the jury that the plaintiff must prove that the defendant knowingly and willfully failed to comply with the statute. Instruction No. 6 said "knowingly permitting" the erection and construction of a scaffold that was not done in a safe, suitable and proper manner is a material averment which plaintiff must prove. Instruction No. 7 told the jury that unless the plaintiff proved that the scaffold was unsafe he could not recover. No. 8 informed the jury that they must find that Shell willfully violated the provisions of the Act. Suggested Instruction No. 10 warned the jury against guessing, speculating and conjecturing on the amount of damages.

The court refused the instruction which went to the very heart of the case; namely, defendant's suggested instruction No. 11, which told the jury that before the plaintiff could recover he would have to prove that Shell had charge of the erection or construction of the refining unit in question before

the terms of the statute would apply to it. Thus, we can see that "in charge of" was not in issue in Kennerly.

The jury found a general verdict in favor of the plaintiff and against the defendant and assessed plaintiff's damages at $77,000. Judgment was entered on this verdict.

Thus, we can see that the case was submitted to the jury not on whether the owner was in charge of the project but on the sole fact that Shell was the owner. The jury had no opportunity to decide whether Shell was the "owner in charge." It was submitted on the fact that Shell was the owner, and the question of non-compliance with the statute alone was for its decision. The jury was never given the opportunity to decide the question of "owner in charge" as a question of fact. This question is a question of fact which the jury was not permitted to pass upon but which it was the duty of the court to submit to the jury as a question of fact and permit them to decide that factual question.

The post trial motions having been overruled, the defendant appealed the case directly to the Supreme Court of Illinois, which court affirmed in Kennerly v. Shell Oil Company, 13 Ill.2d 431, 150 N.E.2d 134.

In the Supreme Court defendant Shell contended that the statute imposes liability only upon the person "having charge of" the work and that it was not liable because the work was being done by an independent contractor, Foster-Wheeler Corporation, the plaintiff's employer. The court said:

"If the question were one of first impression, the contention thus urged would be a serious one, for the liability that the statute imposes is stated in the disjunctive. There is, however, a long history of interpretation that refutes the defendant's position."

Further that:

"Defendant knew that scaffolds were being used, and it cannot escape the mandatory duty that the

statute imposes by closing its eyes to their condition."

The effect of this opinion was that the Act was applicable to the defendant as owner and his duty thereunder was non-delegable. The Supreme Court of Illinois ended its opinion with a significant statement, which this court feels has historical value so far as the instant case is concerned, when it said:

"* * * However that may be, the question of the ultimate rights of the plaintiff, the defendant and the employer were not before the court for determination in this proceeding."

The Supreme Court of Illinois in Gannon v. Chicago, Milwaukee, St. Paul and Pacific Railway Company, 22 Ill.2d 305, 175 N.E.2d 785, again had occasion to consider the interpretation of the Structural Work Act (Illinois Revised Statutes, 1953, Chapter 48, paragraphs 60–69) and more particularly the nature of the owner liability under said Act. In Gannon the engineering and architectural plans for the work were prepared by the office of the chief architect of the railroad, who was charged with inspecting the work to see that it was constructed according to the specifications. All of the construction work including the bricklaying, assembling and constructing of the scaffolds and other operations, was done by E. H. Marhoefer & Co. and its employees under a contract with the railroad. Although the railroad architect and engineers made frequent inspections of the structural activities, there was no inspection of scaffolds or ladders or other appliances at any time, and they exercised no control over the manner in which the work was done.

The Court also gave consideration to the fact that structural work frequently involves the operations of several contractors or subcontractors who are each in charge of a phase of the work and that an injured person has a right of action against any one of them, other than his employer, who may willfully violate or fail to comply with the Act.

In Gannon the court found that the engineering and architectural plans for the work were prepared by the office of the chief architect of the defendant railroad and that he and other personnel made frequent inspections of the construction project, spending as much as five hours a day on the premises on occasions, also that the bricklaying, assembling and construction of scaffolds, and the placement of ladders were performed by employees of the Marhoefer Company and under their supervision. The court then said:

"* * * Under these circumstances, it was at most a disputed question of fact whether the owner could be deemed to be in charge of the construction within the meaning of the act, and it would be the province of the jury, under proper instructions, to make that determination."

No one has a vested right in any decision. Spiegel's House Furnishing Co. v. Industrial Com., 288 Ill. 422, 123 N.E. 606, 6 A.L.R. 540. Gannon v. Chicago, Milwaukee, St. Paul and Pacific Railway Company, 175 N.E.2d 785. Defendant here has no vested right in the Kennerly decision. That case was not submitted to the jury under proper instructions and under the proper interpretation of the statute. The jury had no opportunity to determine whether or not Shell was "in charge of" the construction. They were not given the opportunity under proper instructions to determine as a fact who was "in charge of" the construction. The jury in Kennerly found that the plaintiff was entitled to recover, but it did not establish liability because "in charge of" was not an issue in the case. There is no evidence that there was more than one prime contractor, although Kennerly tried to establish that fact. The contract between Shell and Foster-Wheeler indicates that there was only one prime contractor, namely, Foster-Wheeler, who was to deliver one complete distillation unit, and that the other companies working on this unit were subcontractors as

indicated in the contract. Foster-Wheeler, according to the contract, was to provide the mechanical design and prepare all drawings and specifications and also to furnish all labor and materials, ship, unload, deliver to site, suitably store all materials as required for constructing and erecting the complete 60,000 bbl./day distillation unit at purchaser's refinery in Wood River.

Foster-Wheeler's first contention is that the pleadings, evidence and jury verdict in Kennerly v. Shell Oil, 13 Ill.2d 431, 150 N.E.2d 134, are binding on Shell because it participated in the suit, asserted defenses, cross-examined the witnesses for the plaintiff, submitted its own evidence and argued the case to the jury.

It is difficult for this court to understand why a defendant in a $100,000 lawsuit would not do all the things that Shell did for its own protection under the facts of this case. The result in Kennerly is binding on Shell so far as the parties in that suit are concerned, but such participation would not prohibit Shell from asserting its legal rights against Foster-Wheeler, the defendant in this suit, particularly when Foster-Wheeler was not a party to that suit and more particularly since the issue in that case, namely, who was "in charge of" the construction of the scaffold, was not presented to the jury as a factual situation for its determination.

■ Under the general rules governing the conclusiveness of judgments, the indemnitee, in an action to recover from the indemnitor the amounts paid in satisfaction of a judgment obtained against him by an injured person, is bound by all findings without which the judgment could not have been rendered and, if the judgment in the earlier action rested on a fact fatal to recovery in the action over against the indemnitor, the latter action cannot be maintained. 24 A.L.R.2d 329, 330.

■ The fact which would have been fatal to Shell's recovery in the instant action was never presented to the jury.

There never was a finding by the jury that Shell was "in charge of" the construction, since the trial court in Kennerly refused to give the instruction (defendant's suggested instruction No. 11) which would have submitted that factual question to the jury. The case was not tried on the "in charge of" theory. A jury cannot decide what is not submitted to it.

In Gannon the court said:

"* * * Under these circumstances, it was at most a disputed question of fact whether the owner could be deemed to be in charge of the construction within the meaning of the act, and it would be the province of the jury, under proper instructions, to make that determination."

The Kennerly case has been uniformly interpreted by the Federal and Illinois appellate courts as imposing an absolute and nondelegable duty of compliance on owners, beyond the doctrine of respondeat superior and irrespective of whether control has been given to an independent contractor. Gannon exploded this interpretation.

Kennerly was tried and decided under an interpretation of the Structural Work Act (supra), which was later modified by the Illinois Supreme Court in Gannon. The fact that Kennerly was so decided is not to enure to the damage of Shell here. It had no alternative. It tried to submit all the issues, including the issue as to who was "in charge of" the construction, but its efforts were denied it. It should therefore not be penalized here because of its diligent efforts there.

Shell is not bound by the findings of the jury on issues that were not submitted to it.

The holding herein is not in conflict with the authorities because of the factual differences between the cases cited in defendant's brief and the instant case.

The next question to decide is whether the verdict of the jury against Shell was, or could have been, based upon active

negligence or active violation of the Scaffold Act on the part of Shell.

A jury cannot pass upon a question that is not submitted to them or which is not explained to them in an intelligent manner so that they can differentiate between the two poles as to whether there was active or passive negligence. No evidence was introduced on this phase of the case. No statement was made to them concerning it. No instruction was given. In short, they were not told anything about active or passive negligence. As laymen not versed in the law, they could not be expected to know that this problem was in the case nor be able to make any differentiation between the two unless they had some explanation or advice in the matter.

Foster-Wheeler in its brief says (page 6):

"In Shell's answer to Kennerly's complaint for its additional defense No. 1, it denied that it was in charge of the construction work and exercised no control over it. The pleadings in the Kennerly case, therefore, made a clear-cut issue of the question of control and supervision of the work."

This is not true. The trial court in Kennerly refused to instruct on the question of "in charge of."

The theory of liability in Kennerly was that Shell owned the property, a fortiori, it was liable regardless of any other fact or circumstance. This is borne out by the language of the Supreme Court in affirming the Kennerly judgment.

There were no alternative theories. The cause was submitted on the theory of liability as owner; not whether Shell was liable as owner because it retained control or had charge of the project; not whether it was jointly liable with Foster-Wheeler; not whether it was actively or passively negligent; just was it liable because it was the owner of the property.

How could the general verdict for Kennerly include findings of all facts essential to Shell's liability and import that the jury found all the issues in Kennerly's favor. In Count I of the amended complaint in Kennerly, he charges that Shell was the owner of the premises on which Foster-Wheeler was constructing a building; that plaintiff was a welder; that he fell; that a statute of the State of Illinois provided certain quoted provisions and that it was the duty of Shell to comply therewith; that Shell knowingly and willfully failed to comply therewith by (a) knowingly permitting the erection and construction on its premises of a scaffold that was * * * not safe; (b) knowingly permitting the erection of a scaffold on its premises that was not safe and that did not give adequate protection to life and limb in that it had no guard rail as required by statute; and (c) knowingly permitting the erection of a scaffold on its premises with the platform having loose unnailed boards laid crossways with each other.

Count II charges that the building was jointly controlled by Foster-Wheeler and Shell Oil Company.

Count III charges that the building was jointly occupied and controlled by Foster-Wheeler and Shell Oil Company.

Count IV charges that Shell Oil was the owner of the building.

Shell Oil Company by its answer denied that it was its duty to comply with the statute; that it willfully or knowingly failed to comply with one or more of the provisions of the statute, all as charged in Count I of the amended complaint. It denied that the building was jointly controlled by Foster-Wheeler and Shell as alleged in Count II. It denied Count III which charged that Shell and Foster-Wheeler jointly occupied and controlled the building; and it denied allegations in Count IV charging ownership of the building.

In additional defense No. 1 Shell alleges that it was not in charge of the construction and exercised no control over it. Additional defenses Nos. 2 and 3 are of no importance in this case.

The chronology of the decisions of the various Federal and State courts, interpreting the Illinois Scaffolding Act since 1956, is as follows:

In Schmid v. United States, 154 F. Supp. 81 (E.D.Ill.1957), the court said:

" * * * It was not the intention of the legislature that the owner should be liable regardless of who was in charge of the work, but to hold the person in charge of the work responsible regardless of whether it was the owner, contractor, sub-contractor, foreman, or other person having charge of the building project. * * *

\* \* \* \* \* \*

" * * * the plaintiff has failed to prove an essential element in this case, namely, that the United States was actually *in charge of* the project so as to bring himself within the provisions of the Scaffolding Act; * * *." (Emphasis supplied.)

This was followed by Kennerly v. Shell Oil Company, 13 Ill.2d 431, 150 N.E.2d 134 (1958), in which the Supreme Court of the State of Illinois, interpreting the Scaffolding Act, said:

" * * * It has been regarded from the outset as intended to fix an independent, nondelegable duty of compliance upon the owner of the property and upon each contractor and subcontractor engaged in the work. * * *

\* \* \* \* \* \*

" * * * The duty of each is independent of the duty of the other, and neither can escape his statutory liability by pointing to the other's breach of duty. If injury is caused by a defendant's 'wilful violation' of the act or by his 'wilful failure to comply with any of its provisions,' he is liable regardless of the fault or liability of any other. * * *"

Pankey v. Hiram Walker & Sons, Inc., 167 F.Supp. 609 (S.D.Ill.N.D.1958), pointed out that under the interpretation of Kennerly the Act imposes "absolute liability in civil cases upon each of the persons to whom it is expressly applicable" and "control of the structural activities is not a relevant factor."

The United States Circuit Court of Appeals in Schmid v. United States, 273 F.2d 172 (7 Cir., 1959) followed Kennerly and held that: "The owner's liability is predicated on his failure of compliance, not on any negligence of an independent contractor."

Omitting several intervening cases, we come to Gannon v. Chicago, Milwaukee, St. Paul and Pacific Railway Company, 22 Ill.2d 305, 175 N.E.2d 785 (1961), which modified the Kennerly decision, supra. The Illinois court said:

"The essential issue is the nature of the owner's liability under the Structural Work Act (Ill.Rev.Stat. 1953, chap. 48, pars. 60 to 69), commonly referred to as the Scaffold Act.

\* \* \* \* \* \*

" * * * It is also undisputed that the bricklaying, assembling and construction of scaffolds, and the placement of ladders were performed by the employees of the Marhoefer Company, and under their supervision. Under these circumstances, it was at most a disputed question of fact whether the owner could be deemed to be in charge of the construction within the meaning of the act, and it would be the province of the jury, *under proper instructions* to make that determination. * * *" (Emphasis supplied.)

This brings us up to date on relevant scaffolding decisions under the Illinois law.

■ The question of who is "in charge of" the construction is the basis of liability under the Act—which question must be submitted as a fact question to a jury under proper instructions of the court.

As previously stated, no one has a vested right in any decision and Foster-Wheeler has no vested right in the Ken-

nerly decision, which has now been modified by the Illinois Supreme Court and which on the trial court level was not submitted to the jury under proper instructions as to who was "in charge of" the construction.

That being the case, the court must now decide on the stipulated facts in this case as to who was in charge of the construction of the distillation unit at Shell and which motion for summary judgment should be granted.

As before stated, the contract between Shell and Foster-Wheeler provided:

"FIRST: *SCOPE OF WORK:* CONTRACTOR shall diligently execute and perform the following work:

"The CONTRACTOR will provide mechanical design and prepare all drawings and specifications, and will furnish all labor and materials, ship, unload, deliver to site, suitably store all materials as required, construct and erect the complete 60,000 Bbl./Day Crude Distillation Unit at PURCHASER'S Wood River, Illinois, Refinery, in accordance with the attached EXHIBIT 'C', entitled 'Description of 60,000 Bbl. Crude Distillation Unit, Wood River, Illinois Refinery, Shell Oil Co.', dated September 13, 1951 and the addendum thereto entitled EXHIBIT 'D'.

"CONTRACTOR shall commence the actual performance of the work immediately and will provide every reasonable means within its control to complete the construction of the plant at the earliest possible date."

Under paragraph "C" entitled "OTHER DIRECT COST ITEMS," the purchaser (Shell) agreed to reimburse the contractor (Foster-Wheeler) "All amounts paid by CONTRACTOR for subcontractors pertaining to the work."

Also, under paragraph "G 4, a, b, c" provision is made for adjustments with the contractor for any adjustments it must make with the subcontractors on the job.

Under "FIFTH A, 1" the contractor is responsible for any loss by reason of the liability imposed upon it by law for damages, but the purchaser (Shell) agreed to hold harmless the contractor (Foster-Wheeler) against any liability in excess of limits of insurance set forth in Section B of this Article "FIFTH." And in "1, b" this contractor's liability is extended to "any negligent act or omission of the CONTRACTOR or of its employees, or of its subcontractors, or of such subcontractors' employees, in connection with the performance of the work contemplated by this contract and occurring prior to the date the unit is declared ready to start circulating oil as specified in Article SIXTH herein."

It is, therefore, concluded that Foster-Wheeler was the prime contractor on this job and in charge of the construction and that the other crafts, as detailed in the testimony at the Kennerly trial, were subcontractors of the prime contractor. Even if this were not the case, it frequently occurs that structural work will involve the operations of several contractors or subcontractors who are each in charge of a phase of the work. Gannon v. Chicago, Milwaukee, St. Paul and Pacific Railway Co. (supra).

The contract between the parties provides in paragraph "SIXTH A" that:

"It is agreed that from time to time and upon completion of erection of individual elements of the unit and before insulation and painting, the CONTRACTOR shall inform the PURCHASER in writing that the Unit is ready for mechanical testing. Within five working days after the date of the CONTRACTOR'S written notice, the mechanical tests shall be started.

"It is agreed that the PURCHASER will provide all utilities for testing the equipment.

"Upon completion of the mechanical and cold tests of all components of the unit by CONTRACTOR, the PURCHASER agrees to give to the CONTRACTOR a letter of mechan-

ical acceptance and on that date the unit is thereby declared ready to start circulating oil."

The right to inspection and inspection does not in and of itself place the owner in charge of the job. Inspection by the ordinary meaning of that word could not mean "in charge of." The common, accepted meaning of the word "inspection" is examination or testing.

The contract provided that the contractor was to provide mechanical design and prepare all drawings and specifications, furnish all labor, etc., for the construction and erection of the complete 60,000 Bbl./day crude distillation unit at Shell's Wood River, Illinios refinery.

■ The scaffold in question was constructed by Foster-Wheeler carpenters in charge of Henry Manns, a Foster-Wheeler foreman, out of 4 x 4 uprights with boards across the top from which the men worked. Although the inspectors for Shell did make frequent inspections of the structural activities as the work progressed, as provided in the contract, and more particularly of the welds, there was no inspection of the scaffolds or ladders or other appliances at any time and it (Shell) exercised no control over the manner in which the work was being done. Shell having no control over the manner in which the work was being done, it was not in charge of the work. It not being in charge of the work, it not having constructed the scaffold, it having no obligation or duty under the contract to inspect the scaffold and it in fact not having inspected the scaffold, there was no obligation upon it or liability of it under the Act.

■ To be determined now is the liability of Foster-Wheeler to Shell, if any. It has been said that where an indemnitee has been held liable in an earlier action brought against him by a third party and later brings suit to recover over against an indemnitor for the loss so sustained, the indemnitee is concluded as to facts established against him in the earlier action, and if the judgment in the earlier action rested on a fact fatal to recovery in the action over against the indemnitor, the later action against the indemnitor may not be successfully maintained. American Surety Co. v. Singer Sewing Machine, 18 F. Supp. 750 (D.C.N.Y.1937); 24 A.L.R.2d 329, 330.

■ The judgment in Kennerly, under the facts, could not have been rendered unless the case had been submitted to the jury on the one question which under the facts would have made Shell liable and that was if it was "in charge of" the project. This question was not submitted.

The defendant in its brief on page 3 says:

"Inasmuch as the pleadings in the Kennerly case, evidence offered in support thereof and the finding of the jury based thereon are binding upon Shell in this action, we must look to the pleadings and evidence to determine whether the verdict of the jury against Shell was or could have been based upon active negligence or active violation of the Scaffold Act on the part of Shell."

There is nothing in the pleadings, the instructions, the verdict of the jury or the judgment of the court which would give us just a glimmer of hope of finding therein that the jury ever, even remotely, considered the active and passive negligence question. Their's was a limited consideration of the case under an erroneous interpretation of the statute. From the stipulated facts in this case the court finds that the active and passive negligence question is not determinative by the verdict of the jury.

■ Foster-Wheeler was an independent contractor who had charge of the construction. The scaffold was constructed with materials furnished by Foster-Wheeler, built by Foster-Wheeler carpenters and used solely by its employees. Shell under the contract was under no duty to furnish this scaffold and it didn't; it was under no duty to

construct this scaffold and it didn't; it was under no duty to supply carpenters to build this scaffold and it didn't; it was under no duty to inspect this scaffold and it didn't; and it exercised no control over the manner in which the work was being done.

It is true that Shell made frequent inspection of the work, as provided in the contract, and particularly of the welds; but there was no inspection of the scaffold and Shell exercised no control over the manner in which the work was being done.

From all the stipulated facts the court determines that Foster-Wheeler was actively negligent.

■ From the number of courts that have considered the question, it may well be stated that the rule against indemnity between tort-feasors does not apply between parties, one of whom is the active and primary wrongdoer and the other bears a passive relationship to the cause of the injury. Moroni v. Intrusion-Prepakt, Incorporated, 24 Ill.App.2d 534, 165 N.E.2d 346, and the cases cited therein.

■ When Shell and Foster-Wheeler entered into the contract, the obligation of Foster-Wheeler was to deliver one complete distillation unit to Shell—Foster-Wheeler to furnish all the labor, etc. And although not specifically stated therein, there was an implied obligation on Foster-Wheeler to perform the contract in a reasonably safe manner. This implied obligation was breached by Foster-Wheeler. Such implied obligations have been recognized by Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp. (1956), 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133; Weyerhaeuser S.S. Co. v. Nacirema Operating Co. (1958), 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491; Crumady v. The Joachim Hendrik Fisser (1959), 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413.

Foster-Wheeler contends that the Scaffold Act is penal in nature and therefore Shell should not recover here. Infractions of the law are punished where the law is violated. Where no law is violated there can be no punishment. Foster-Wheeler's contention in this regard begs the question and needs no more discussion.

■ Foster-Wheeler's final contention is that the Illinois Workmen's Compensation Act precludes the recovery from it for Kennerly's injuries for more than its liability under the Illinois Workmen's Compensation Act and to permit Shell to recover would be tantamount to enlarging Kennerly's right as an employee to recover from Foster-Wheeler.

A similar situation existed in Moroni (supra) in which the court said:

"Both parties agree that the precise situation here presented is one of first impression in Illinois, but there is considerable authority in other jurisdictions. We have studied those cases and we are convinced that the Workmen's Compensation Act did not abolish the right of a third party to be indemnified under the principle announced in John Griffiths & Son Co. v. National Fireproofing Co., supra, and the other cases heretofore cited. The principal cases to support this view are Westchester Lighting Co. v. Westchester County Small Estates Corp., 1938, 278 N.Y. 175, 15 N.E.2d 567; Lunderberg v. Bierman, 1954, 241 Minn. 349, 63 N.W.2d 355, 43 A.L.R. 865; McDonnell Aircraft Corp. v. Hartman-Hanks-Walsh Painting Co., Mo.1959, 323 S.W.2d 788; American Dist. Tel. Co. v. Kittleson, 8 Cir., 1950, 179 F.2d 946; Rich v. United States, 2 Cir., 1949, 177 F.2d 688; Burris v. American Chicle Co., 2 Cir., 1941, 120 F.2d 218; Baugh v. Rogers, 1944, 24 Cal.2d 200, 148 P.2d 633, 152 A.L.R. 1043. * * *"

Shell does not sue for damages because of Kennerly's injuries, but sues in its own right because Foster-Wheeler was actively negligent in not providing for its workmen a safe scaffold from which to work. The independent obligation which an active tort-feasor owes to a passive tort-feasor is sufficient basis to maintain the present suit.

To discuss each case in which the common law right of indemnification against the contractor, when the latter was guilty of active or primary wrongdoing, would extend this already lengthy opinion beyond all reasonable bounds. Suffice it to cite only Moroni v. Intrusion-Prepakt, Incorporated, supra; Griffiths & Son Co. v. National Fireproofing Co., 310 Ill. 331, 141 N.E. 739, 38 A.L.R. 559; Gulf, Mobile & Ohio R. Co. v. Arthur Dixon Transfer Co., 343 Ill.App. 148, 98 N.E.2d 783 (1951).

As this court said in Skinner v. United States, 1960, D.C., 209 F.Supp. 854:

"Under Illinois law there exists a general principle that there is no contribution among tort-feasors. There are, however, exceptions to this general rule, which have been recognized by the courts of the State of Illinois and other courts and by the federal courts. One of these exceptions is here involved. That exception provides as follows: Where two parties acting together commit an illegal or wrongful act, the party injured may hold both responsible for the damage resulting from their joint act and neither can recover from the other the damages he may have paid or any part of them, but where one does the act which produces the injury and the other does not join in the act but is thereby exposed to liability and suffers damage, the latter may recover against the principal delinquent and the law will inquire into the real delinquency and place the ultimate liability upon him whose fault was the primary cause of the injury. Gulf, Mobile & Ohio R. Co. v. Arthur Dixon Transfer Co., 343 Ill.App. 148, 98 N.E.2d 783. Griffiths & Son Co. v. Fireproofing Co., 310 Ill. 331, 141 N.E. 739."

Shell is entitled to recover from Foster-Wheeler the amount of the judgment and interest it paid to Kennerly in the amount of $85,020.83, plus interest at the legal rate from the date of payment to the date of this opinion.

Shell's motion for summary judgment is hereby allowed and Foster-Wheeler's motion for summary judgment is hereby denied.

Parties to settle the order.